BUFFALO FAULTLESS PANTS CO., Inc., a Corporation,

v.

The UNITED STATES.

No. 49161.

United States Court of Claims.

June 5, 1956.

———◆———

Bert B. Rand, Washington, D. C., for plaintiff. Hans A. Nathan, Washington, D. C., was on the briefs.

Martin E. Rendelman, New York City, with whom was Asst. Atty. Gen. George Cochran Doub, Baltimore, Md., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiff brings this action under the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 869, 992, 41 U.S.C.A. § 106 note, to recover for losses it sustained in the performance of certain war contracts. The relevant sections of the statute read as follows:

"Where work, supplies, or services have been furnished between September 16, 1940, and August 14, 1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941 (50 U.S.C., Supp. IV, app., sec. 611), such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President within sixty days after the date of approval of this Act, to consider, adjust, and settle equitable claims of contractors, including subcontractors and materialmen performing work or furnishing supplies or services to the contractor or another subcontractor, for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14, 1945, without fault or negligence on their part in the performance of such contracts or subcontracts. * * *

*    *    *    *

"Sec. 6. Whenever any claimant under this Act is dissatisfied with the action of a department or agency of the Government in either granting or denying his claim, such claimant shall have the right within six months to file a petition with the Court of Claims * * * asking a determination by the court of the equities involved in such claim; and upon the filing of such a petition, the court, sitting as a court of equity, shall have jurisdiction to determine the amount, if any, to which such claimant and petitioner may be equitably entitled * * *."

The parties have stipulated that the losses amounted to $91,086.36. The sole question to be determined is whether the losses were incurred without fault or negligence of the plaintiff.

Plaintiff is a New York corporation which had its principal place of business at all times material to the question at issue in Buffalo, N. Y.

Plaintiff had a number of contracts with the Government during the period September 16, 1940, to August 14, 1945. It sustained an overall loss of $94,395.48 in the performance of these contracts. The net loss attributable to the two contracts involved in this litigation was $91,086.36.

Plaintiff was a small manufacturer of trousers. By December 31, 1942, plaintiff employed only 30 to 35 persons. It had about 40 sewing machines, all of them single-needle machines. Prior to that time it had never produced more than 700 trousers per day.

On December 29, 1942, plaintiff sent a telegraphic offer to manufacture 250,000 khaki cotton trousers for Lend Lease at 80 cents per pair. The specifications called for walking shorts with double needle seaming. The Government was to furnish the cloth, the plaintiff the other necessary materials. A formal contract was entered into on December 31, 1942.

Subsequently plaintiff made an offer to manufacture another 100,000 trousers of the same type, except with single needle seaming. A contract for this amount was dated January 20, 1943, and stipulated the price at 80 cents per pair. The delivery schedule for the contracts contemplated delivery of 341,000 trousers by June 19, 1943, with a maximum production of up to 24,000 units per week. It was evident, therefore, that to fulfill its obligations under the contracts would have required greatly expanded facilities and stepped-up methods of production on the part of the plaintiff.

In January plaintiff secured the services of Mr. Louis Stein, a production man of long experience, as its plant superintendent. About that time it was decided to change the method of production from the bundle system to what is called the straight-line system. The latter system is described as the "production line installed in the needlework industry." Plaintiff expected to expand its production by installing four such lines, by purchasing much additional machinery, and hiring many new employees.

The plaintiff made its bid with the understanding it would receive preference rating certificates to enable it to purchase certain specific items of machinery. The plaintiff did not show that it did not receive these certificates. It made considerable effort to obtain the necessary machinery but it never did secure enough of the equipment it needed to produce the contract items in sufficient numbers to maintain the production rate of 4,000 pairs of trousers per day as required by the contract. Plaintiff claims that the Government was at fault in not assuring it the necessary supply of machines, but we do not think the Government ever undertook to do so. All that the Government did was to promise the certificates, not the actual machines.

The usual method under the priorities system was to issue preference certificates which would enable the holder to purchase and use the designated critical materials wherever they might be found. It would have been wholly impracticable for the Government to undertake, under wartime conditions, to actually locate the materials for all the thousands of production contracts. It did undertake to assist essential wartime contractors by furnishing preference certificates, and by providing that without them a contractor could neither purchase nor use essential wartime materials.

Plaintiff had hired a number of operators with little or no experience in the needle trades. These persons had to be trained and closely supervised. Due to the presence of many higher-paying war industries in the Buffalo area, plaintiff had a high turnover in its personnel which created additional problems of training and supervision. This was an area of serious labor shortage both at the time the bid was submitted and during performance of the contract, and this fact was known to both plaintiff and defendant at both times. These difficulties were compounded by reason of the trousers' complicated buckle assembly, a part which could be attached properly to the garment only by a tailor of real skill.

The plaintiff's difficulties soon became evident in its production. It fell behind in deliveries and had a high rate of rejection. On March 17 Major Christie of the Philadelphia Quartermaster Depot made an investigation into the difficulties at plaintiff's plant. He observed insufficient machines and a great excess in cut garments over the amount that could then be utilized for sewing. Another representative of the defendant investigated the conditions at plaintiff's plant on May 14. He observed that the plant was greatly overcut and that of the 2 day-shift and 2 night-shift lines only 1 was operating satisfactorily. The inefficiency of the operators was due largely to lack of adequate supervision. Overcutting hampered operations by cluttering the factory and causing the cut cloth to become dirty and unraveled.

Plaintiff makes much of the fact that 29 contracts were awarded for this type of garment at the time plaintiff made its 2 contracts and that, as of June 24, 1943, 21 contracts were delinquent. But delinquent contracts other than plaintiff's were about 36 percent delinquent at that time, whereas plaintiff's contracts were over 55 percent delinquent. Nor do we think plaintiff is justified in asserting that the Government was as much at fault in awarding the contracts to plaintiff as plaintiff was in accepting them.[1] It is unquestionably true that

1. At the time plaintiff submitted its first bid for the manufacture of 250,000 pairs of trousers, at 80 cents per pair, it made an alternative offer to manufacture 500,-

plaintiff was operating under most difficult conditions; we cannot say, however, that plaintiff has shown that the losses which did occur were without its fault. We think, on the contrary, that deficiencies in organization and management were largely responsible for plaintiff's losses. It certainly is no fault of the Government that plaintiff had prior or concurrent commitments in its civilian business as a result of which plaintiff diverted part of its productive capacity from military to civilian work. Moreover, some of these commitments were incurred while plaintiff was experiencing the very difficulties with its military work that we have described and some of the diverted labor had undoubtedly been trained for work on the military contracts.

Plaintiff has tried to show that other contractors suffered losses on the walking shorts contracts. The evidence on this point is not very extensive. Moreover, this line of proof cannot be very persuasive unless it is fairly clear that the other contractors who form the basis of the comparison were themselves typical and were themselves without fault.

We do not think that a mere minor fault would preclude plaintiff's recovery. But that is not the instant case. Plaintiff's losses, though perhaps in some minor part attributable to the fact that plaintiff made its bid too low, are largely attributable to its own poor organization so that it cannot be said that plaintiff suffered losses without fault on its part.

Plaintiff undertook to deliver under a contract which required it to expand production, machinery, and labor many-fold. Perhaps anyone was bound to fail in these circumstances. But in view of plaintiff's deficiencies in coping with the managerial problems which such an expansion raises, plaintiff's failure is attributable largely to factors for which plaintiff assumed responsibility.

000 pairs at 85 cents. Fortunately for it, this alternative offer was not accepted. In these circumstances plaintiff can hard-

Plaintiff's petition will be dismissed. It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

ly justify its effort to require the defendant to share the blame for a contract which was beyond plaintiff's capacity.